UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT SPANO, Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. 3:07-cv-01461 (VLB) |
| GENGRAS MOTOR CARS, INC., Defendant. | : | September 30, 2009 |

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. #19]**

Before the Court is a motion for summary judgment filed by the Defendant, Gengras Motor Cars, Inc. ("Gengras"). The Plaintiff, Robert Spano, brought this suit claiming Gengras' termination of his employment violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., the Family and Medical Leave Act (FMLA) 29 U.S.C. § 2601 et seq., and Connecticut common law because it constituted a negligent infliction of emotional distress. Gengras argues that Spano has failed to set forth sufficient evidence for a reasonable jury to find that 1) Gengras fired Spano because of his age, 2) Gengras fired Spano because he took an approved, unpaid medical leave, or 3) Gengras negligently inflicted emotional distress on Spano. For the reasons stated hereafter the Defendant's motion for summary judgment is granted as to the common law claim for negligent infliction of emotional distress, but is denied for the ADEA and FMLA claims.

**Facts**

**The following facts relevant to the Defendant's motion for summary judgment are undisputed unless otherwise noted. Spano was born in 1953. Beginning in the 1970s, Spano worked for Robert Newman as the parts manager at a dealership known as Williams Ford and later assumed duties to maintain the parts inventory and supervise the wholesale parts division. In January 2001, Spano moved to another Newman dealership, Newman Lincoln-Mercury ("Newman L-M"). At Newman L-M, Spano served as the Parts Manager and his duties included maintaining inventory and ordering parts, but did not include the sale of wholesale parts. In March 2004, Gengras acquired Newman L-M, along with several other dealerships belonging to the Newman family. By virtue of the acquisition of the dealerships, all of Newman L-M's current employees, including Spano, became at-will employees of Gengras.**

**On February 25, 2005, Spano received an annual performance evaluation which he reviewed with his direct supervisor, Sebastian Chodulski. [Doc. #24, Exhibit 2]. Overall, Spano was evaluated as meeting expectations and having developmental opportunities. The evaluation was based on a numerical scale ranging from 6 to 10, defining a "6" as "unsatisfactory," an "8" as "expected performance," and a "10" as "exceptional." Id. For each of the evaluation's twelve performance criterion, Spano scored an "8," except for the category of dependability, on which he scored a "10." The evaluation also featured comments to support each ranking and a brief "Summary of Employee**

**Contributions Over Review Period." The comments noted the value of Spano's experience and his ability to manage inventory well. The comments also stated that Spano needed to "show more initiative" and had an "opportunity to improve . . .wholesale activity" which would require his active involvement. Id.**

**On March 17, 2005, Jim Jeffries, Gengras' Director of Fixed Operations, wrote Gengras senior management and noted that he had told Spano that he needed to expand into wholesale parts sales and directed Spano to develop a wholesale parts sales plan within two weeks. The correspondence acknowledged that Spano would be on vacation during the upcoming week. Jeffries' email also noted that Spano had already set up a meeting with the Ford Motor Company ("Ford") wholesale representative for April 14, 2005, and that he had instructed Spano to gather information on their wholesale programs as preparation for the meeting. [Doc. #34 , Exhibit E]. As part of a subsequent exchange to his email, Jeffries wrote Chodulski on March 18, 2005, to note that he was "impatient" with Spano. Jeffries and Chodulski agreed that Spano could condense the parts storage area to make room for wholesale operations. On March 30, 2005, Jeffries instructed Spano, to provide a plan for condensing and cleaning the parts area in advance of the April meeting with Ford. [Doc. #34 , Exhibit E].**

**On April 14, 2005, Jeffries wrote senior management to report on his meeting with a wholesale dealer specialist and noted the benefits of receiving Ford certification as a wholesale parts dealership. The email noted that in order**

**to become certified, 30% of all Gengras part sales had to be wholesale transactions. [Doc. #34 , Exhibit F]. Gengras management was of the opinion that the wholesale certification process would reasonably take sixty to ninety days. [Doc. #34, Exhibit #C].**

**At some point in April, Spano informed Jeffries and other Gengras managers that he had some sort of problem that affected his urination. The record does not clearly specify the level of detail that Spano gave these supervisors. [Doc. #34, Exhibit A].**

**On April 21, 2005, Jeffries emailed Janet Porriello, Gengras' Director of Human Resources, stating that he had "inherited weak service and parts managers at L-M. They are doing poorly. Neither has responded well to our efforts to improve them. We need to replace both of them." [Doc. #34, Ex. G]. Jeffries instructed Porriello, as part of a subsequent email exchange on the same day, to run a blind online advertisement for Spano's replacement that was tailored to Ford experience. [Doc. #34, Ex. G]. On April 26, 2005, Jeffries reported to executive management that Spano was "trying to demonstrate that he is still in the game." [Doc. #23, Ex. 6]. The service manager was subsequently terminated on May 5, 2005.**

**Shortly thereafter, Spano told Gengras that he had been diagnosed with bladder cancer and would require an unpaid medical leave. Spano went on leave starting May 13, 2005. Prior to taking medical leave, Spano was informed by Chodulski that Jeffries was complaining, via email, about his work performance,**

**particularly with regard to ordering parts for inventory. Spano initially anticipated only one week of leave, but, due to complications, his physician advised him to take five additional weeks of leave. Spano reported this need for extended leave to Porriello and claims that she responded, "that long?" The Plaintiff alleges that Porriello told Spano that physicians occasionally overestimate the amount of time required for a leave. Spano returned to work on June 20, 2005, a week before his scheduled leave period expired. After a one week "no lifting" restriction, he resumed his normal duties without accommodation.**

**On July 25, 2005, Gengras hired Jeffrey Corey, a forty-year-old, former co-worker of Spano, to assist Spano in the parts department. On September 8, 2005, Gengras offered Spano's position as parts manager to Corey. Corey accepted the position and Spano was terminated by David Brown, the Chief Operating Officer, on September 9, 2005, in the presence of Jeffries and Porriello. Spano was told that his termination was based on his failure to increase wholesale parts sales as outlined during the April meeting with Ford. In 2005, Gengras terminated a total of six former Newman Ford employees citing poor performance.**

**Standard**

**Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the**

light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 166 (2d Cir. 2003). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2004). "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

Spano's ADEA and FMLA discrimination claims are governed by the McDonnell Douglas standard:

> To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [test] laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). . . In a nutshell, a plaintiff first bears the 'minimal' burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment

> action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson v. New York City Dept. of Education, 457 F.3d 211, 215 (2d Cir. 2006) (internal quotation and citation omitted).

Analysis of the Plaintiff's ADEA Claim

To establish a prima facie case of age discrimination under the ADEA, Spano must demonstrate that "(1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered [an] adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006).

The parties agree that Spano satisfies the first and third prongs of the analysis, by virtue of his age and the fact that Spano was terminated; however the parties disagree as to whether Spano can establish the second and fourth prongs of the analysis.

With regard to Spano's job performance, Gengras argues that Spano did not perform satisfactorily because he did not increase wholesale parts sales and failed to secure Ford's wholesale parts sales certification as directed in his February 25, 2005 performance evaluation. Spano argues non-responsively that his performance evaluation clearly shows that he was performing adequately. The performance evaluation indeed demonstrates that Spano had a satisfactory

job performance as of February 25, 2005 but does not address his performance between February 2005 and his termination in September of that year. Although Jeffries noted concerns about Spano and made efforts to encourage Spano to take greater initiative, especially with respect to wholesale certification, it is unclear that Spano had a sufficient opportunity to comply with Jeffries request for wholesale certification, especially considering his illness and medical leave from April through June of 2005.

The record shows that on March 17, 2005, prior to his medical leave, Spano immediately set-up a meeting for April 14, 2005 to determine Ford's certification requirements in response to his evaluation. Taking into account Spano's intervening illness and sick leave and Gengras' estimate that sixty to ninety days were reasonably needed to achieve 30% wholesale sales, there is a genuine issue of fact as to whether Spano had an opportunity to meet Gengras' demands for wholesale certification. Therefore there is also a genuine issue of material fact as to whether Spano's performance was unsatisfactory due to his failure to achieve certification, and whether Gengras' asserted neutral reason for his termination is pretextual.

With regard to the fourth prong, Spano argues that the action occurred under conditions giving rise to an inference of discrimination. In weighing a difference of age of eight years between a Plaintiff and his replacement, the Second Circuit noted that:

Although an inference of discrimination cannot be based on a plaintiff's

> **replacement by another person who is only slightly younger, we have held that the replacement of an employee within the protected class by two others, one 11 years younger and the other eight months younger, satisfied the fourth element of a prima facie case under the ADEA. A difference of eight years between the age of the person discharged and his replacement, as in the instant case is not insignificant.**

**Tarshis v. Reise Org., 211 F.3d 30, 38 (2d Cir. 2000), abrogated by Swierkiewicz v. Sorema N. A., 534 U.S. 506, 122 S.Ct. 992 (2002) on other grounds.**

**In turn, this Court has previously noted that a "twelve year age difference certainly suffices as a substantial discrepancy in age to raise an inference of discrimination." Pleau v. Centrix, Inc., No. 06cv01626 Westlaw 4380515, at *5 (D. Conn. Sept. 24, 2008) aff'd, No. 08-4895-Cv 2009 WL 2603396 (2d Cir. Aug 26, 2009). A twelve year age difference is presented in the instant action.**

**Additionally, during the Plaintiff's deposition of E. Clayton "Chip" Gengras, III, an owner of Gengras Motor Cars, Inc., Mr. Gengras notes his perception of the workers that he inherited from Newman L-M. Gengras comments "[m]y impression of the previous organization was very little communication and no accountability, meaning no consequences for poor action, inaction, improvement. That was my perception. That it was a good place to go and retire." [Doc. # 34, Exhibit C]. Even taking into consideration that Gengras' comment was made while alleging a lack of accountability under the former management, this comment is subject to varied interpretation. A jury could reasonably infer that Gengras harbored animus toward and dismissed the value of older workers such as Spano. As a result, this comment and the twelve-year age difference between**

**Spano and the individual that Gengras hired as his replacement establishes conditions giving rise to an inference of discrimination, the fourth prong of a prima facie case pursuant to ADEA analysis.**

**Gengras proffers a legitimate, non-discriminatory reason for its adverse employment decision to rebut the presumption of discrimination established by the Plaintiff's prima facie case. The Defendant notes that Spano failed to achieve the performance goals that were presented to and expected of him. To this end, Gengras cites the Plaintiff's 2005 performance evaluation, relevant email exchanges involving John Jeffries, the nature of efforts to replace Spano, and testimony about the Plaintiff's performance. The Defendant also notes that Spano was among a larger group of inherited Newman employees that Gengras terminated as part of an assessment of the inherited workers' value. As noted above, the totality of the facts and circumstances raise a genuine issue of material fact as to whether the asserted performance deficiencies are pretextual.**

**To survive summary judgment, Spano must show that the Defendant's proffered reasons for Spano's termination are a pretext for discrimination. McPherson, 457 F.3d at 215. The Supreme Court's decision in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) identified that a prima facie case combined with sufficient evidence of pretext, without additional evidence of discrimination, can allow for a finding of unlawful discrimination. The Second Circuit has noted that although:**

> **Reeves prevents courts from imposing a per se rule requiring in all**

> **instances that an ADEA claimant offer more than a prima facie case and evidence of pretext. . . . [T]he Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.**

**Schnabel v. Abramson 232 F.3d 83, 90 (2d Cir. 2000) (internal quotations omitted).**

**In applying the Second Circuit's analysis, the Court finds that Spano could satisfy his ultimate burden of persuading the trier of fact. The Defendant cites Spano's performance and failure to respond to Gengras' requests for improvements as a legitimate reason for his termination. The cited performance concerns largely, if not entirely, relate to Spano's inability to attain wholesale certification. As previously discussed, Gengras arguably failed to afford the Plaintiff an opportunity to respond to his employer's feedback and attain the requested certification. While Gengras stressed the importance of the wholesale parts expansion project, Spano notes that he took immediate steps toward certification and the specific benchmarks of the project were not communicated to him until after April 14, 2005—when Gengras first learned of the 30% requirement for obtaining wholesale parts certification. As such, Jeffries April 21, 2005, email requesting a replacement for Spano is arguably premature. Additionally, Jeffries comment to executive management that the Plaintiff was "trying to demonstrate that he is still in the game" indicates that although Spano responded to Gengras' requests for improved performance and greater initiative, Jeffries discounted Spano's efforts. Moreover, the facts that Spano left for**

medical leave on May 13, 2005 and returned on June 20, 2005, only to be replaced by Jeff Corey on September 9, 2006, further evidence that Spano did not receive a fair opportunity to meet the benchmarks of the wholesale expansion project.

Based on this record, a trier of fact could reasonably find that Gengras management, due to age-based animus, readily discounted the value of an older Newman employee such as Spano, had little interest in allowing him to respond to requests for improvements, provided an unreasonably limited opportunity to respond to such requests, and disregarded any efforts that Spano did make to improve. As a result, a trier of fact could reasonably find that the Defendant's proffered reason is pretextual and that Spano was terminated due to age-based animus.

Analysis of the Plaintiff's FMLA Claim

Spano also claims that Gengras retaliated against him for exercising his rights under the FMLA. "The FMLA gives eligible employees an 'entitlement' to twelve workweeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Sista v. CDC Ixis N. America, Inc., 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA provides a cause of action for retaliation, which is analyzed under the McDonnell Douglas burden-shifting analysis. Potenza v. City of N.Y., 365 F.3d 165, 167-168 (2d Cir. 2004).

**Accordingly, to establish a prima facie case of retaliation in violation of FMLA, Spano must demonstrate that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the action occurred under conditions giving rise to an inference of retaliatory intent." Id. at 165.**

**The record and the Court's earlier discussion of Spano's job performance shows that Spano meets the first three requirements of the prima facie case. Spano also meets the fourth requirement due to the temporal proximity between the dates that he took leave, from May through late June, and his termination in early September. Weichman v. Chubb & Son, 552 F. Supp. 2d 271, 289 (D. Conn. 2008).**

**The Defendant once again offers its issues with the Plaintiff's job performance as a legitimate, nondiscriminatory reason for termination and Spano again cites the lack of a reasonable opportunity to respond to his employer's criticism as evidence of pretext.**

**Gengras notes that the FMLA provides "no greater job security than that to which the employee would have been entitled to prior to taking leave." Hale v. Mann, 219 F.3d 61, 66 (2d Cir. 2000). Indeed, the FMLA does not prevent termination where the party identifies "a nonpretextual reason for his removal based on events which occurred prior to his going on leave." Id. Thus the fact that Spano was terminated shortly after returning from leave does not necessarily discount Gengras' proffered reason. The record reflects that Jeffries stated his**

**intention to replace Spano and also the Newman L-M Service manager in late April and that Jeffries actually terminated the Service Manager shortly before the start of Spano's leave.**

**Hale, however, still requires that the reason for removal, even if based on events that occurred prior to going on leave, be a "nonpretextual reason." Id. The Court's analysis of the Plaintiff's ADA claim identifies sufficient factual matter to create a question of whether the proffered explanation is an effort to conceal other motivations. While the Court's analysis of Plaintiff's ADEA claim demonstrates that sufficient question arises as to whether the proffered explanation is pretextual, Schnabel again urges a consideration of whether Gengras' explanation is a pretext for retaliation due to the exercise of rights under the FMLA. The Court finds the Director of Human Resource's commentary on the projected length of Spano's leave, evidence that Gengras may have been aware of Spano's urinary symptoms as early as mid-March and thus motivated by this knowledge to initiate termination in April, and the temporal proximity of Spano's termination highlight that there are sufficient issues of material fact warranting the denial of summary judgment as to Spano's retaliation claim under the FMLA.**

**Negligent Infliction of Emotional Distress Claim**

**Spano argues that, because Jeffries had decided to terminate him in April but did not do so until September, Gengras "exploited" him in the interim time period and a jury could find that Gengras' termination was "outrageous" and caused Spano severe emotional distress.**

**In Connecticut, the tort of negligent infliction of emotional distress "in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process." Perodeau v. City of Hartford, 259 Conn. 729, 792 A.2d 752, 765 (2002) (internal quotations omitted). Spano submits Peralta v. Cendant Corp., 123 F. Supp. 2d 65, 83 (D. Conn. 2000), a case in which there was evidence that a supervisor had created a false paper trail to justify firing an employee because of his sex, as an example of where an employer's conduct was held to be sufficiently unreasonable because it exceeded the "boundaries of socially tolerable conduct." Id. at 82. Spano's reliance on Peralta fails both because the conduct about which he complains did not occur in the course of, or contemporaneously with, his termination and also because it is not so egregious as to constitute a basis for his claim. Morris v. Hartford Courant Co., 200 Conn. 676, 683-84, 513 A.2d 66, 70 (1986).**

**The Connecticut Supreme Court adopted a bright line rule that a plaintiff may not maintain a claim of "negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished**

**from conduct occurring in the termination of employment."Perodeau, 259 Conn. at 762-63. The Court reasoned that if such claims were permitted**

> **employees who fear lawsuits by fellow employees may be less competitive with each other, may promote the interests of their employer less vigorously, may refrain from reporting the improper or even illegal conduct of fellow employees, may be less frank in performance evaluations, and may make employment decisions. . . on the basis of fear of suit rather than business needs and desires.**

**Id., at 758. Courts have declined requests to expand the relevant period. See, Tracy v. New Milford Pub. Sch., 101 Conn. App. 560, 572, 922 A.2d 280, cert. denied 284 Conn. 910, 931 A.2d 935 (2007); O'Connor v. Bd. of Educ., 90 Conn. App. 59, 877 A. 2d 860 (2005).**

**Gengras' alternating encouragement of Spano to increase wholesale sales and criticism of Spano for a failure to do so immediately is not unreasonable or wrongful. Gengras established wholesale parts certification as a central goal and required an increase in sales whether Spano continued to be parts manager or not. Even if Spano was to be terminated, as long as he held the job, Gengras was entitled to critique his performance and encourage stronger results. Gengras never suggested to Spano after his annual performance evaluation that his job was secure or that his performance, as it impacted wholesale sales, was completely adequate. Therefore, even if Jeffries resolved to terminate Spano in April, it was not wrongful or beyond the "boundaries of socially tolerable conduct" to encourage Spano to continue to develop wholesale efforts after Jeffries had made this determination. The Court therefore concludes that Spano**

**has not presented sufficient evidence for a jury to find Gengras' conduct unreasonable.**

**Conclusion**

**The Defendant's motion for summary judgment [Doc. #19] is GRANTED as to the Plaintiff's claim for negligent infliction of emotional distress, and DENIED as to the Plaintiff's claims pursuant to the ADEA and the FMLA.**

**IT IS SO ORDERED.**

**/s/**

**Hon. Vanessa L. Bryant**

**United States District Judge**

**Dated at Hartford, Connecticut: September 30, 2009.**